UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JOSEPH M. HAMPTON & BRENDA S. HAMPTON,

      Plaintiffs-Appellants,

                       Case # 17-CV-6808-FPG

v.

                       DECISION AND ORDER

ONTARIO COUNTY, NEW YORK
JOHN DOE, & JANE DOE,

      Defendants-Appellees.
_____

GLIEE V. GUNSALUS & BRIAN L. GUNSALUS, SR.,

      Plaintiffs-Appellants,

                       Case # 17-CV-6810-FPG

v.

                       DECISION AND ORDER

ONTARIO COUNTY, NEW YORK,
JOHN DOE, & JANE DOE,

      Defendants-Appellees.
_____

**INTRODUCTION**

   Appellants Mr. and Mrs. Gunsales and Mr. and Mrs. Hampton ("Appellants") appeal[1] from an order of the United States Bankruptcy Court for the Western District of New York, filed November 6, 2017, which granted Appellee Ontario County's Motion to Dismiss Appellants' complaints. ECF No. 1-2. For the reasons stated below, the Bankruptcy Court's decision granting the County's Motion to Dismiss is REVERSED.

---

[1]The Gunsaleses and Hamptons filed separate complaints that seek identical relief, arising out of "substantially similar operative facts," ECF No. 32 at 2, and are represented by the same counsel. Additionally, the appellants and appellees used virtually the same briefs in both cases. This Court, like the Bankruptcy Court below, will issue a single decision. The cases are not joined or consolidated. Any citation to "ECF" refers to the docket for case # 17-cv-6806, unless otherwise noted.

## BACKGROUND

Although the Court assumes the parties' familiarity with the facts of this case, which are more extensively detailed in the Bankruptcy Court's opinion, a summary follows.

### I. Gunsalus Foreclosure

The Gunsaluses owned a home in the town of Phelps, New York that was free and clear of mortgages. *See* Case # 17-cv-6810, ECF No. 1-2 at 4. After Mr. Gunsalus was laid off in 2014, the Gunsaluses failed to pay the real estate taxes on their home, totaling $1,236.52. ECF No. 8 at 16. On November 10, 2014, Ontario County began to enforce a lien for the unpaid taxes. ECF No. 1-2 at 4. Pursuant to New York's Real Property Tax Law ("RPTL"), the County waited 21 months before commencing an *in rem* tax foreclosure action on October 2, 2015. *Id.* The Gunsaluses had until January 15, 2016 to redeem their home from foreclosure or serve an answer to the foreclosure action. *Id.* The Gunsaluses answered the foreclosure petition, but a final judgment of foreclosure was ultimately entered on June 1, 2016. *Id.* at 5. Under the RPTL, the judgment entitled the County to possession and all equity in the property. *Id.* The County then scheduled a foreclosure auction of the property for May 17, 2017.

On April 28, 2017, the Gunsaluses filed a Chapter 13 Plan providing for payment of the tax arrears. ECF No. 8 at 16. On May 3, 2017, the Gunsaluses filed an Adversary Proceeding against the County, seeking to avoid the transfer of their home in tax foreclosure as constructively fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B). *Id.* On May 17, 2017, the County sold the home at an auction for $22,000. Pursuant to the parties' stipulation, however, the County notified bidders that title to the Gunsaluses' home was in dispute and would not be transferred to a third party until determination of this adversary proceeding. *Id.* at 17. Ontario County is entitled to the entire surplus of approximately $20,763.48. *Id.* at 20.

**II.     The Hamptons**

The Hamptons owned a home in Gorham, New York that was free and clear of mortgages. After Mrs. Hampton lost her job due to chronic health issues, the Hamptons failed to pay their 2015 real estate taxes, totaling $5,201.87. ECF No. 1 at 6; ECF No. 7 at 5. Ultimately, a default judgment of foreclosure was entered in Ontario County's favor on March 2, 2017, which entitled the County to possession and all equity in the property. ECF No. 1 at 7. Two months later, the Hamptons filed a Chapter 13 bankruptcy plan providing for payment of their entire tax arrears. ECF No. 7 at 15. Three days later, they filed an Adversary Proceeding against the County, seeking to avoid the transfer of their home in tax foreclosure as constructively fraudulent pursuant to 11 U.S.C. § 548(a)(1)(B). *Id.* On March 17, 2017, the County sold the home at auction for $27,000. *Id.* at 17. Pursuant to the parties' stipulation, the County notified bidders that title to the Hamptons' home was in dispute and would not be transferred to a third party until determination of this adversary proceeding. Ontario County is entitled to the entire surplus of approximately $21,798.13. *Id.* at 30.

**STANDARD OF REVIEW**

The district court has jurisdiction to hear final and interlocutory appeals from bankruptcy court orders. *See* 28 U.S.C. § 158(a). The district court reviews findings of fact under the "clear error" standard and findings of law *de novo*. *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012). The *de novo* standard also applies to mixed findings of fact and law. *See Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575 (2d Cir.1994). The district court may "affirm, modify or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." *Morgan v. Gordon*, 450 B.R. 402, 405 (W.D.N.Y. 2011).

**DISCUSSION**

Appellants ask the Court to reverse the Bankruptcy Court's order because they believe that it erroneously applied the U.S. Supreme Court's holding in *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) to their case. *See* ECF No. 7 at 9. Ontario County argues that the Bankruptcy Court correctly applied *BFP* and that Appellants lack standing to challenge the transfers of their properties. ECF No. 10 at 50. The Court must first decide the threshold matter of standing before addressing the merits of Appellants' cases. *See Warth v. Seldin*, 442 U.S. 490, 498 (1975); *Cty. of Clinton v. Warehouse at Van Buren St., Inc.*, 496 B.R. 278, 280 (N.D.N.Y. 2013).

**I. Standing**

Ontario County argues that its tax lien bars Appellants from claiming a federal homestead exemption,[2] which consequently deprives the Hamptons of standing to bring an avoidance proceeding under Sections 522(h) and 548 of the Bankruptcy Code.

The Appellants claimed the federal homestead exemption under Section 522(d)(1) of the Bankruptcy Code. ECF No. 11 at 31. Under the plain language of Section 522(h), debtors who can exempt property have standing to bring avoidance actions. *See Deel Rent-A-Car, Inc., v. Levine*, 721 F.2d 750, 754 (11th Cir. 1983). Nothing suggests that Appellants are precluded from claiming the federal homestead exemption, and the caselaw that the County uses in its argument to the contrary concerns the New York State homestead exemption, which, unlike the federal homestead exemption, does not protect debtors whose taxes are unpaid. *See Johnson v. Cty. of Chautauqua*, 449 B.R. 7, 12 (W.D.N.Y. 2011). Furthermore, the County interprets Section 522(c)(2)(B) as barring the Appellants from claiming the federal homestead exemption, when it

---

[2] The federal homestead exemption allows debtors to keep their home in lieu of it becoming part of the bankruptcy estate and thereby being available to satisfy creditors. *See* Carol A. Pettit & Vastine D. Platte, Cong. Research Serv., R40891, Homestead Exemptions in Bankruptcy After BAPCA (2011).

4

merely provides that exempt property remains liable for a tax lien. *See* 11 U.S.C. § 522(c)(2)(B). Appellants are not attempting to avoid paying the tax liens on their respective properties; they are attempting to avoid a transfer of the property. Accordingly, because Appellants "do not seek to avoid the tax lien under section 545," but are instead challenging "the tax sale as constructively fraudulent under section 548, section 522(c)(2)(B) does not negate their potential standing under section 522(h)." *Hollar v. U.S.*, 174 B.R. 198, 204 (M.D.N.C. 1994). Accordingly, as the Bankruptcy Court below found, Appellants have standing to bring these suits.

## II.     Fraudulent Conveyance Elements

Bankruptcy law allows courts to set aside a sale or transfer of an insolvent debtor's property if the transfer was constructively fraudulent. 11 U.S.C. §§ 548(a)(1), 522(h). The goals of fraudulent conveyance law include avoiding a "windfall to one creditor at the expense of others," *In re Smith*, 811 F.3d 228, 238 (7th Cir. 2016) and preventing "a disproportionate loss to the debtor," *In re Chase*, 328 B.R. 675, 681 (D. Vt. 2005).

To state a fraudulent conveyance claim, debtors must allege facts supporting the following statutory elements: (1) the debtor had an interest in the property; (2) a transfer of the property occurred within two years of the bankruptcy petition; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the debtor received less than a reasonably equivalent value in exchange for the transfer. 11 U.S.C. § 548(a). Here, the parties only dispute the last element—whether the debtor received less than reasonably equivalent value in exchange for the transfer.

## III.    "Reasonably equivalent value" as Examined by the Supreme Court in *BFP*

"Reasonably equivalent value" is not defined in Section 548, but the United States Supreme Court examined the term in the mortgage foreclosure context in *BFP v. Resolution Trust Corp.*,

5

511 U.S. 531 (1994). The plaintiff in *BFP*, a partnership formed to purchase a beachfront home in California, defaulted on its home loan payments. *Id.* at 533. The home eventually sold at a foreclosure sale for $433,000. *Id.* at 531. Alleging that the home was actually worth over $725,000 at the time of sale, the plaintiff challenged the sale as a fraudulent transfer under Section 548(a). The Court framed the question presented as "whether the amount of debt satisfied at the foreclosure sale (viz., a total of $433,000) is 'reasonably equivalent' to the worth of the real estate conveyed." *Id.* at 536. Before *BFP*, circuit courts used different methods to determine the worth of the real estate conveyed at a foreclosure sale. *Compare Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201 (1980) (5th Cir. 1980) (indicating in dicta that any foreclosure sale yielding less than 70% of fair market value should be invalidated), *with In re Bundles*, 856 F.2d 815 (7th Cir. 1988) (holding that there is a rebuttable presumption that the foreclosure sale price is sufficient to withstand fraudulent conveyance attack). Some circuits, for instance, "refer[red] to fair market value as the benchmark against which determination of reasonably equivalent value is to be measured." *BFP*, 511 U.S. at 537. The *BFP* Court expressly rejected this method, acknowledging that the term "fair market value" does not appear in Section 548 and has "no applicability in the forced-sale context," which is "the very antithesis of forced-sale value." *Id.* at 537. Property that "must be sold within" the "time and manner strictures of state-prescribed foreclosure" is "simply *worth less*," as no "one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques." *Id.* at 539 (emphasis in original).

The Supreme Court ultimately held that a reasonably equivalent value for foreclosed property "is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." *Id.* at 545. This holding established a conclusive presumption of reasonably equivalent value when the procedures of state foreclosure laws have

been followed. In reaching this holding, the Supreme Court emphasized the goals of federalism and ensuring that the "title of every piece of realty purchased at foreclosure would [not] be under a federally created cloud." *Id.* at 544.

Before stating its holding, however, the Supreme Court discussed the evolution of foreclosure in the United States, from the days of "strict foreclosure" where "the borrower's entire interest in the property was forfeited, regardless of any accumulated equity" to the "development of foreclosure by sale (with the surplus over the debt refunded to the debtor) as a means of avoiding the draconian consequences of strict foreclosure." *Id.* at 541. The Supreme Court characterized today's foreclosure laws as "typically requir[ing] notice to the defaulting borrower, a substantial lead time before the commencement of foreclosure proceedings, publication of a notice of sale, and strict adherence to prescribed bidding rules and auction procedures." *Id.* at 542. Significantly, the Supreme Court expressly limited its holding to "*mortgage* foreclosures of real estate," noting that "considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." *Id.* at 537 n.3 (emphasis added). The Supreme Court did not elaborate on these precise considerations, which has led to disagreement about whether or not the *BFP* presumption applies to tax lien foreclosure. Here, the Bankruptcy Court answered that question in the affirmative.

## IV. The Bankruptcy Court's Application of *BFP* to this Case

The Bankruptcy Court, applying *BFP*'s holding to this case, determined that Ontario County is entitled to a "conclusive presumption of having provided reasonably equivalent value" in exchange for the transfer because the tax lien foreclosure of the Gunsaleses' and Hamptons' properties was conducted in conformity with state law procedures. ECF No. 1-2 at 17. In doing so, the Bankruptcy Court departed from its previous view, expressed in *In re Canandaigua*, 521

7

B.R. 457 (W.D.N.Y. 2014), that the absence of competitive bidding in the RPTL meant that the *BFP* presumption did not apply to tax foreclosures conducted under the statute. In disavowing its *Canandaigua* decision, the Bankruptcy Court determined that a "careful re-reading of the *BFP* decision" leads to the conclusion "that the presence or absence of competitive bidding was not the keystone to the *BFP* majority's holding." ECF No. 1-2 at 11. The Bankruptcy Court stressed *BFP*'s language that state foreclosure laws "***typically require*** . . . strict adherence to prescribed bidding rules and auction procedures." *Id.* at 12 (quoting *BFP*, 511 U.S. at 542) (emphasis in original). According to the Bankruptcy Court, this language "connotes something common among state laws, but not universal or absolute—and certainly not 'mandatory.'" *Id.* In other words, to the Bankruptcy Court, the "Supreme Court did not attempt to define a sub-set of state foreclosure law requirements that it deemed to be 'mandatory' for the BFP holding to apply." *Id.*

V. ***BFP*'s Application to New York Tax Foreclosure Scheme**

To the Bankruptcy Court and to Ontario County, then, *BFP* held that a transfer of debtor property is presumed to be for reasonably equivalent value so long as state foreclosure laws were followed, and that the substance and characteristics of a state foreclosure law are irrelevant when determining whether a debtor receives reasonably equivalent value in exchange for his property. This Court and several other courts in the Second Circuit respectfully disagree with that interpretation of *BFP*'s holding.

The decision below does not fully heed the context of the *BFP* opinion and the lead-up to its holding. The Court in *BFP* expressly stated that state foreclosure laws had evolved to "avoid the draconian consequences of strict foreclosure," 511 U.S. at 541, but the RPTL has not. Unlike the foreclosure law in *BFP* and the "typical" state laws that the Supreme Court described before reaching its holding, the RPTL is a strict foreclosure regime that does not provide for a *pre-seizure*

8

auction whereby the debtor may recover equity.[3] This difference between the RPTL and the state laws the *BFP* Court considered is significant to fraudulent conveyance analysis. *See*, *e.g.*, *In re Wentworth*, 221 B.R. 316, 320 (Bankr. D. Conn. 1998); *In re Herkimer,* No. 04-90148, 2005 WL 6237559, at *4 (Bankr. N.D.N.Y. July 26, 2005); *In re Murphy*, 331 B.R. 107, 118 (Bankr. S.D.N.Y. 2005); *Cty. of Clinton*, 496 B.R. at 283.

The Supreme Court in *BFP* acknowledged that fair market value is largely irrelevant in the foreclosure context, but it also described "the inquiry under § 548" as "whether the debtor has received value that is substantially comparable to the *worth* of the transferred property." 511 U.S. at 548 (emphasis added). In other words, the foreclosure in *BFP* was not a fraudulent conveyance because the debtor received value reflecting the worth of its property. The value the debtor in *BFP* received was necessarily less than the fair market value of its property because the mortgage foreclosure "completely redefin[ed] the market in which the property [was] offered for sale; normal free-market rules of exchange [were] replaced by the far more restrictive rules governing forced sales." *Wentworth*, 221 B.R. at 320 (internal quotation marks omitted). Consequently, *BFP* reasoned that "the only legitimate evidence of the property's value at the time it [was] sold [was] the foreclosure-sale price itself." *Id.* (internal quotation marks omitted). The foreclosure-sale price that the debtor in *BFP* received reflected the worth of the property in a distressed, forced-sale situation.

The facts supporting *BFP*'s holding do not exist here. Unlike the disputed forced sale in *BFP*, the sale of Appellants' property conducted under the RPTL "eliminated rather than redefine[d] the market." *Id.* Accordingly, the rationale underlying *BFP*'s presumption of reasonably equivalent value does not apply here because there were "no market forces at work at

---

[3] Although the County auctioned Appellants' properties, that occurred after the County already took title to the properties and thus any bidding rules or procedures did not benefit the Appellants.

all." *Murphy*, 331 B.R. at 120. Whereas the forced sale price in *BFP* was at least "legitimate evidence of the property's value," the amount of a tax lien is "*no* evidence whatsoever of" property value. *Id.* If anything, the sale prices of $22,000 and $27,000 are evidence of the properties' worth, but the County and not the Appellants will receive the vast majority of those proceeds. This Court therefore declines to extend *BFP*'s holding to a materially different case.

This holding comports with the Second Circuit's rationale expressed in *In re Harris*, 464 F.3d 263, 273 (2d Cir. 2006). Although the Circuit did not directly reach the merits, it expressed concern in a situation where, as in this case, the RPTL allowed a New York county to receive a "windfall" at the expense of other creditors and cautioned the lower court "that there is a strong presumption of not allowing a secured creditor to take more than its interest." *Harris*, 464 F.3d at 273; *see also In re Chase*, 328 B.R at 681 ("There is nothing in [Vermont's strict foreclosure law] to prevent a foreclosing mortgagee with a debt of $2,000 from foreclosing on property worth $100,000 and retaining the property, notwithstanding the colossal surplus value of the property. When such a transfer occurs, the creditor gets a windfall, the debtor's other creditors suffer, and the purpose of fraudulent conveyance law—making all of the debtor's assets available to his or her creditors and assuring an equal distribution to similarly situated creditors—is frustrated."). If this Court affirmed the Bankruptcy Court's decision, Ontario County would receive surpluses of nearly $22,000 in one instance and more than $20,000 in another. The Appellants, on the other hand, assert that they would be homeless and unable to repay their other creditors through Chapter 13 bankruptcy. The Second Circuit expressly warned against this result in *Harris*, and its reasoning disfavors extending *BFP*'s presumption to the facts of this case.

This Court also disagrees with the County's argument that allowing the Appellants to avoid their foreclosures would frustrate the County's interest in timely collecting property taxes and

ensuring clear title to real estate. Ontario County has a legitimate interest in tax enforcement, but that "interest cannot overcome Congress' policy choice that reasonably equivalent value must be obtained for a transfer of a debtor's property in the bankruptcy context, where the rights of other creditors are prejudiced." *Murphy*, 331 B.R. at 120. Ultimately, state interests must be balanced against "the Bankruptcy Code's strong policy favoring equal treatment of creditors." *In re McMahon*, 129 F.3d 93, 97 (2d Cir.1997). Moreover, the County's interests in collecting taxes and avoiding "clouds on title" would not be upset by fraudulent conveyance avoidance. The Appellants have made all ongoing tax payments that have come due since the deadline to redeem their home passed, and their Chapter 13 plans provide for payment of all their owed real estate taxes. There is also no question of title to the Appellants' homes, as adversary proceedings were filed before the auction and bidders were notified of the litigation before bidding. The Court is unwilling to subordinate the Appellants' and their other creditors' interests to the County's speculative, unfounded fears.

Reasonable minds may differ over the applicability of *BFP* to the RPTL. *See*, *e.g.*, Marie T. Reilly, *The Case for the Tax Collector*, 18 *J. Bankr. L. & Pract.* 628 (2009) (arguing that the tax collector's right to surplus should not be challenged by a fraudulent conveyance action). However, given *BFP*'s express reluctance to extend its holding to tax foreclosures and the compelling reasons that other courts in this Circuit have given for refusing to do so, this Court holds that Ontario County is not entitled to the conclusive presumption of having provided reasonably equivalent value for the foreclosure of Appellants' homes.

## CONCLUSION

For the reasons stated, the Bankruptcy Court's decision granting Ontario County's Motion to Dismiss is REVERSED. This case is REMANDED to the Bankruptcy Court for further proceedings consistent with this opinion.

IT IS SO ORDERED.

Dated: July 18, 2018
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court